IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KEALIA WATER COMPANY HOLDINGS, LLC, | ) ) | Civ. No. 08-00333 ACK-BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PLANTATION PARTNERS KAUAI, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND GRANTING DEFENDANT'S MOTION TO STAY ALL PROCEEDINGS PENDING ADJUDICATION BY THE HAWAI'I PUBLIC UTILITIES COMMISSION**

Defendant moves this Court for dismissal of the Complaint for lack of subject matter jurisdiction.  The Court finds that the Hawai'i Public Utilities Commission must initially adjudicate Plaintiff's claims.  Accordingly, the Court denies Defendant's Motion to Dismiss but grants Defendant's Motion to stay the proceedings in this case pending an adjudication by the Public Utilities Commission.

**PROCEDURAL BACKGROUND**

On July 21, 2008, Plaintiff Kealia Water Company Holdings, LLC ("Plaintiff" or "KWC"), filed a Complaint for declaratory relief and damages ("Complaint") in this Court against Plantation Partners Kauai, LLC ("Defendant" or "PPK").

The Complaint alleges (1) that Defendant PPK breached its contract with Plaintiff KWC (the "Water Service Agreement"), and (2) that such breach caused damages to Plaintiff and its existing wells such that Plaintiff is excused from any further obligations under the Water Service Agreement.  Complaint ¶ 8.  The Complaint further alleges that a declaration of the parties' rights in their ongoing dispute will save both time and money for both sides.  Complaint ¶ 12.  Therefore, the Complaint requests that this Court (1) award Plaintiff damages caused by Defendant's breach, (2) declare the parties' rights and obligations under the Water Service Agreement, and (3) enjoin Defendant from any further violation of the Water Service Agreement.  Complaint at 5.

On November 11, 2008, Defendant filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, or in the alternative, to stay proceedings pending adjudication by the Public Utilities Commission ("Motion").  Defendant attached the Declaration of H. Andrew Friend, the manager of PPK ("Friend Decl."), authenticating exhibits A-J.  Defendant also attached the Declaration of Lauren R. Sharkey, Defendant's counsel, which authenticated exhibits K-M.

On January 30, 2009, Plaintiff filed its Memorandum in Opposition to Defendant's Motion ("Opposition").  Plaintiff

attached the declaration of its counsel, Paul Alston, which authenticated exhibit 1 to the Opposition.

On February 6, 2009, Defendant filed its Reply in Support of the Motion ("Reply").

The Court held a hearing on the Motion on February 17, 2009.  At the Court's request, Defendant filed a Supplemental Declaration of H. Andrew Friend ("Supp. Friend Decl.") on February 19, 2009.  Plaintiff filed a Response to the Supplemental Declaration ("Supp. Decl. Response") on February 23, 2009, attaching the Declaration of C. Clark Libscomb ("Libscomb Decl."), Plaintiff's vice-president.

## FACTUAL BACKGROUND[1]

Plaintiff is a Delaware limited liability company and a citizen of the State of Colorado.  Complaint ¶ 4.  Defendant is a Hawai'i limited liability company and a citizen of California and Hawai'i.  Complaint ¶ 5.

On August 29, 2003, Plaintiff filed with the State of Hawai'i Public Utilities Commission ("PUC") an Application for a Certificate of Public Convenience and Necessity ("CPCN") and for Approval of Rules, Regulations and Rates.  Motion Ex. A.

---

[1] The facts as recited in this Order are for the purpose of disposing of the instant Motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

Plaintiff sought approval from the PUC in order to provide potable water and operate a water system in Kealia, Kaua'i.  Id.

On December 3, 2003, Kealia Plantation Company, LLC ("KPC"), Defendant's predecessor-in-interest, was allowed to intervene in the PUC proceeding.  Motion Ex. C at 2.  The PUC then ordered Plaintiff, KPC, and the Consumer Advocate (from the Department of Commerce and Consumer Affairs) to negotiate a proposed stipulated prehearing order for the PUC to review.  Such a stipulation was filed with the PUC on July 22, 2004.  Id. at 3.

Through much of 2004 and 2005, Plaintiff, KPC, and the Consumer Advocate continued to engage in discovery, information requests, as well as the filing of direct testimony and exhibits in preparation for the PUC hearing on Plaintiff's CPCN application.  Motion Ex. B at 5-6.  During this period, Plaintiff and KPC entered into a grant of easements on December 22, 2004, whereby Plaintiff received easements over the property owned by KPC (now owned by Defendant PPK) for infrastructure and access so that Plaintiff could adequately provide water to KPC's property.[2/]  See Motion Ex. E.  The grant of easements also reserved in KPC the right to extract potable water itself from the property, including the right of KPC to form its own water

---

[2/] Although the representatives of each party signed the grant of easements on or about December 22, 2004, the grant of easements was not recorded in the State of Hawai'i Bureau of Conveyances until March 9, 2006.  Motion Ex. E at 1.

company if it so desired.[3/]  Id. ¶ 4.  Together with the grant of
easements, Plaintiff and KPC entered into a Water Service
Agreement ("WSA") on December 22, 2004, for the purpose of
"set[ting] forth the manner and terms of potable water service to
the KPC parcels."[4/]  Motion Ex. F at 1.

        Under the WSA, Plaintiff agreed to provide three
hundred thousand gallons of potable water per day for the benefit
of the KPC parcels.  However, the WSA also stipulated that in
order to supply potable water to the KPC parcels, KPC needed to
expand the infrastructure on the KPC parcels in order to connect
with Plaintiff's infrastructure.[5/]  WSA ¶ 4(a).  On the other
hand, if they so chose, KPC could also drill its own wells to
provide potable water itself to the KPC parcels instead of
utilizing Plaintiff's services.  Id. ¶ 1(c); see Motion Ex. E ¶ 4
(KPC reserved the right to extract any potable water that it
wanted, including the right to form its own water company).  The
WSA's only restriction on KPC providing its own water service was

_____

        [3/] The grant of easements also placed a limitation on
Plaintiff to take no more than 1,872,000 gallons of water per
day.  Motion Ex. E ¶ 4.

        [4/] Defendant PPK, as successor in interest to KPC, assumed
all of KPC's rights and obligations under the WSA.  See WSA ¶
11(d); Opposition at 2.

        [5/] The WSA stated that "the KPC Owners will have to expand
the Infrastructure in accordance with this Agreement and the
[(PUC-approved)] Rules."  Motion Ex. F ¶ 4(a).

that KPC must not drill a well within six hundred feet of any well operated by Plaintiff.[6/]  <u>Id.</u> ¶ 1(d).

The WSA provided that once KPC or any successive owner (in this case, Defendant) began to subdivide the property, Plaintiff would issue a "Will Serve Letter" stating Plaintiff's agreement to provide potable water according to the terms of the WSA.  <u>Id.</u> ¶ 6.  The WSA also explicitly provided that Plaintiff's rules and regulations, to the extent approved by the PUC, would govern the service of potable water to KPC.  <u>Id.</u> ¶ 10.  Plaintiff retained the right to enforce these rules "to the extent permitted by the PUC."  <u>Id.</u> ¶ 11(g).  Further, the WSA stipulated that Plaintiff could enforce the terms of the WSA using "all remedies available to it at law or equity," but noting that such remedies were only available "to the extent permitted by the PUC and applicable law."  <u>Id.</u>  Where a dispute arose under the WSA, the parties agreed "first to try in good faith to settle the

---

[6/] Along with the 600 foot limitation under the WSA, the grant of easements further provided that, in making improvements on the "Non-exclusive Easement Area," KPC could not do anything that would have "an adverse effect on the quantity or quality of water produced by the Infrastructure" or "prevent the Water Company from delivering water to any person or party."  Motion Ex. E ¶ 6(b).  The grant of easements also stated that KPC's right to take potable water and form its own water company was subject to the rights of Plaintiff to take up to 1,872,000 gallons of water per day.  <u>Id.</u> ¶ 4.  Thus, it would appear that Defendant PPK, as successor in interest to KPC, could not take water from its property, or make improvements in the easement area, to the extent that it would interfere with Plaintiff's ability to take up to 1,872,000 gallons per day.

dispute by mediation . . . before resorting to arbitration, litigation or some other dispute resolution procedure." Id. ¶ 11(h).[7]

After more than a year of negotiations and exchanging of information, Plaintiff, KPC, and the Consumer Advocate filed with the PUC a Stipulation of the Parties in Lieu of Evidentiary Hearing ("Stipulation") on June 9, 2005.  Motion Ex. B.  Under the Stipulation, Plaintiff, KPC and the Consumer Advocate agreed to three main points: (1) that Plaintiff was fit to operate a water system in Kealia, Kaua'i, (2) that the proposed water service was required by public convenience and necessity, and (3) that Plaintiff's proposed tariffs, rates, charges, revenue forecasts, projected operating expenses, projected rate base, and projected rate of return were reasonable.  Id. at 7.  The parties stipulated to a variety of rates, charges, and expenses that had been calculated for the water operation and for the providing of potable water.  See id. at 13-31.  The Stipulation also provided that the water system would supply water to: (1) an existing subdivision of sixty-one residences, a general store, and a rodeo facility (the "Existing Subdivision"); and (2) former agricultural lands subdivided for development and owned by KPC

---

[7] Despite this provision, no mediation was ever initiated by either party prior to the filing of this lawsuit.  At the hearing, neither party argued that enforcement of the mediation provision of the WSA was necessary.

and Kealia Makai Holdings, LLC, an affiliate of Plaintiff.[8/]  Id.
at 10.

On August 16, 2005, the PUC issued its decision and
order, generally adopting the rates and conclusions of the
Stipulation.  See Motion Ex. C.  The PUC further approved
Plaintiff's proposed rules and regulations for water service and
ordered Plaintiff to file its initial tariff within seven days.
Id. at 31-32.  On August 23, 2005, Plaintiff filed its initial
tariff with the PUC, which included the rate schedule, charges,
rules, and regulations for the operation of the water service as
approved by the PUC.  Motion Ex. G.

After acquiring the property from KPC, Defendant began
plans to subdivide its property.  In order to obtain final
subdivision approval, Defendant sought a "Will Serve Letter" from
Plaintiff as agreed to under the WSA.  See Motion Ex. I.  On
April 25, 2007, Plaintiff provided Defendant with a Will Serve
Agreement ("Will Serve Agreement") in lieu of a Will Serve
Letter.  Motion Ex. H.  Under the Will Serve Agreement, Plaintiff
reiterated its commitment to provide potable water to Defendant's
property.  Id. at 1.  The Will Serve Agreement stated that such

_____

[8/] Included in the agricultural lands owned by Kealia Makai
Holdings was a subdivision for development called Kealia Kai.
Plaintiff anticipated that Kealia Kai would consist of thirty-
five homes, and that all these homes would require Plaintiff's
water service by 2006 when the homes would be completed.  Motion
Ex. B at 10-11.

water service would be subject to: the WSA, the grant of easements, Plaintiff's rules and regulations (as approved by the PUC), and any "changes or modifications as may be authorized or required by the Hawaii Public Utilities Commission."  Id.

Thereafter, the parties could not agree on how the water would actually be provided by Plaintiff to Defendant's subdivision.  Sometime in 2007, Defendant received approval for its infrastructure expansion plan from the County of Kauai, as part of the overall approval by the County for Defendant's planned subdivision.  Supp. Friend Decl. ¶5.  However, when Defendant presented this infrastructure expansion plan to Plaintiff sometime in 2007, it was rejected because Plaintiff believed it would result in unnecessarily high maintenance costs. Supp. Friend Decl. ¶ 6; Libscomb Decl. ¶ 6.  Up until the fall of 2007, Defendant claims that it "repeatedly but unsuccessfully sought the Water Company's approval of the water infrastructure design."  Supp. Friend Decl. ¶ 5.

Plaintiff contends that Defendant's infrastructure expansion plan was "inefficient and wasteful" because it "covers a very large geographic area with relatively few customers."[9/]

_____

[9/] Plaintiff's concerns with the infrastructure expansion dealt with (1) the design of the system, (2) its physical components, and (3) the cost of maintaining it (i.e. flushing). Plaintiff determined that the design was "inefficient and wasteful" because it included "dead ends" which would necessitate the need for flushing.  Libscomb Decl. ¶ 6.  Plaintiff was also concerned that the physical components of the system "would

Libscomb Decl. ¶ 6.  Therefore, the system would have to be

flushed with three hundred thousand gallons of water each

month.[10/]  Id.  The parties disagree on who would have to bear the

cost of this monthly flushing.  Plaintiff contends that such

flushing would be included in the PUC-approved rates for water,

which would be paid by Defendant.  See id. ¶ 8.  Defendant, on

the other hand, argues that the cost of flushing the system is a

maintenance cost, and that maintenance costs are covered by the

Plaintiff.  See Supp. Friend Decl. ¶ 7.

After conducting an "evaluation" and "analysis" of the

proposed infrastructure as well as its ability to provide water

under the Will Serve Agreement, Plaintiff sent a letter to

Defendant on May 23, 2008.  Motion Ex. I.  In the letter,

Plaintiff determined that there were only two options for

providing potable water to Defendant's subdivided parcels:

either (1) Defendant would have to buy and take over Plaintiff's

company entirely, or (2) Plaintiff and Defendant could enter into

a new agreement allowing Plaintiff to sell water to the Defendant

---

require costly repair or replacement that were not economically
feasible."  Id. ¶ 9.  Thus, Plaintiff proposed a "looped system,"
which cost more to build, but would at least eliminate the need
for flushing.  Id. ¶ 7-8.

[10/] This roughly translates to approximately ten thousand
gallons per day that Plaintiff alleges would be required for
flushing the system (in addition to the three hundred thousand
gallons per day that Plaintiff agreed to reserve for Defendant's
use under the WSA).  See WSA ¶ 1(a).

in bulk.[11/]  <u>Id.</u>  Plaintiff's decision was based on its

determination that providing water any other way "would be a

detriment and financial burden to the Kealia Water Company."[12/]

<u>Id.</u>

    Plaintiff's letter also warned Defendant of a potential

breach of the WSA – i.e., Defendant had been seen apparently

drilling its own wells within close proximity (apparently less

then 600 feet) of one of Plaintiff's wells.[13/]  <u>Id.</u>  Plaintiff

demanded that Defendant seal the wells it was working on and

formally file for abandonment of the wells.  <u>Id.</u>  Defendant

responded to Plaintiff's allegations by asserting that it was in

full compliance with the WSA and stating that it was only

rehabilitating wells that have existed since 1928, and thus no

---

[11/] It is unclear from the documents provided to the Court
what exactly the terms of the bulk service agreement would have
entailed.  Regardless, it is sufficient that such a bulk service
would not have used the applicable water rates approved by the
PUC in the rules and regulations.  <u>See</u> Friend Decl. ¶¶ 3-4.

[12/] This was apparently not the first time that Plaintiff
proposed bulk water service, although it appears to be the last
time that such an offer was made.  In 2007, Plaintiff proposed
"several" offers for bulk water service, but "[Defendant] PPK
rejected every draft [of the offer]."  Opposition at 3-4.  These
offers appear to have occurred during the same period that
Defendant "repeatedly" sought approval from Plaintiff for the
infrastructure expansion plan, which Plaintiff also rejected.
Supp. Friend Decl. ¶ 5.

[13/] Plaintiff reported seeing the "drilling" by Defendant for
the first time on January 25, 2008, several months after both
sides rejected each other's proposals for both bulk water service
and the infrastructure expansion.

drilling of new wells (that would be in violation of the WSA) was

occurring.[14/]   Motion Ex. J.   Defendant also refused to accept

either of Plaintiff's alternatives for water service.[15/]   Friend

Decl. ¶ 4; accord Motion at 5.

Based on Defendant's refusal to accept one of the two

alternatives for water service, and because Defendant refused to

halt work on preexisting wells (which Plaintiff has perceived as

---

[14/] There is no dispute that Defendant was in fact working on
two preexisting wells on its property.  Motion at 5; Opposition
at 4.  However, the parties dispute whether rehabilitating
preexisting wells would be a breach of the WSA.  Plaintiff
asserts that "testing, cleaning, and installing new well casings"
for already existing wells is still a breach of the WSA.
Opposition at 4.  Defendant counters that the WSA only
contemplates "drilling" of wells and that Defendant was not
engaged in such "drilling."  Motion at 5.

At the hearing, Plaintiff also asserted that there are other
potential sites on the property where Defendant could drill new
wells without violating the six hundred feet provision of the
WSA.  Defendant did not refute this point, and has only stated
that it has been unable to locate any other preexisting wells on
the property (but Defendant made no statement as to its ability
to drill new wells).  See Supp. Friend Decl. ¶ 14.  In any event,
the Court finds that drilling new wells would involve a
substantial expense for Defendant and the ability (or inability)
to drill new wells has no effect on whether the PUC should
initially hear this matter.

[15/] This refusal did not mean that Defendant was abandoning
the WSA or was unwilling to accept any future water service from
Plaintiff.  Instead, Defendant maintains that "it remains in the
best interest of development of the Property to preserve all
water rights for the Property, including that individual owners
in the project be provided water by the Water Company in
accordance with the terms of the Water Service Agreement."  Supp.
Friend Decl. ¶ 12.  Plaintiff is similarly still willing to
perform its obligations under the WSA, on the condition that
Defendant "agrees to install acceptable infrastructure."
Lipscomb Decl. ¶ 11.

a breach of the WSA), Plaintiff withdrew the Will Serve Agreement on June 9, 2008.  Motion Ex. K.  If unable to reach an agreement with Plaintiff as to water service, Defendant has represented that it is contemplating the formation (or is already in the process of forming) its own water company to provide water service to its property.  Friend Decl. ¶ 5; Motion at 6.  At the same time, however, Defendant maintains that it wishes to "preserve all water rights for the Property," including the ability to receive water service from the Plaintiff under the WSA, particularly if Defendant is precluded from using the preexisting wells.  Supp. Friend Decl. ¶¶ 12-13.

Although still willing to provide water under the WSA, Plaintiff contends that Defendant is in breach of the WSA and that Plaintiff is not required to provide water service "on terms that are uneconomical and unacceptable to [Plaintiff]." Complaint ¶¶ 7, 10.

## STANDARD

As a preliminary matter, the Court will treat the instant Motion as a 12(b) motion to dismiss.  Plaintiff contends that the Court should review the Motion as one for summary judgment.  Defendant counters that the Motion is brought properly under Fed. R. Civ. P. 12(b).  The Court agrees with Defendant.

A court's subject matter jurisdiction may be challenged under Federal Rule of Civil Procedure 12(b)(1).  "A party

13

invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." See Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996).

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court is not "restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988). "Once the moving party [converts] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Savage v. Glendale Union High Sch., 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

The failure to exhaust administrative remedies is properly considered under a 12(b)(1) motion to dismiss where exhaustion is required. See Puga v. Chertoff, 488 F.3d 812, 815 (9th Cir. 2007)("'if exhaustion is required by statute, it may be mandatory and jurisdictional'" (quoting Laing v. Ashcroft, 370 F.3d 994, 997 (9th Cir. 2004)) (brackets omitted).

Even when a remedy is not a mandatory one, a motion to dismiss for failure to exhaust administrative remedies is still proper under rule 12(b), although not necessarily under 12(b)(1).

"Exhaustion of administrative remedies, when not made mandatory by statute, is . . . a prudential doctrine." <u>Santiago v. Rumsfeld</u>, 425 F.3d 549, 554 (9th Cir. 2005).  "[T]he failure to exhaust nonjudicial remedies that are not jurisdictional [(and are thus prudential)] should be treated as a matter in abatement, which is subject to an unenumerated Rule 12(b) motion rather than a motion for summary judgment." <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1119 (9th Cir. 2003); <u>see</u> <u>Stauffer Chemical Co. v. Food & Drug Administration</u>, 670 F.2d 106, 108 (9th Cir. 1982) ("Because failure to exhaust administrative remedies is a matter in abatement, it should be raised by a motion to dismiss.").  Thus, a 12(b) motion to dismiss is the proper means of raising a party's failure to exhaust nonjudicial remedies, whether mandatory or not.  <u>Ritza v. International Longshoremen's and Warehousemen's Union</u>, 837 F.2d 365, 368-69 (9th Cir. 1988); <u>see</u> <u>Inlandboatmens Union of Pacific v. Dutra Group</u>, 279 F.3d 1075, 1083 (9th Cir. 2002) ("a failure to exhaust non-judicial remedies <u>must</u> be raised in a motion to dismiss") (emphasis added);

The Court reviews an unenumerated 12(b) motion to dismiss for failure to exhaust nonjudicial remedies in a manner similar to that for motions to dismiss under 12(b)(1) for lack of subject matter jurisdiction.  "In deciding a motion to dismiss for a failure to exhaust nonjudicial remedies, the court may look

beyond the pleadings and decide disputed issues of fact."[16]
Wyatt, 315 F.3d at 1119-20; cf. McCarthy, 850 F.2d at 560 (9th
Cir. 1988) ("[W]hen considering a motion to dismiss pursuant to
Rule 12(b)(1) the district court is not restricted to the face of
the pleadings, but may review any evidence, such as affidavits
and testimony, to resolve factual disputes concerning the
existence of jurisdiction.").  In hearing the motion to dismiss,
"the court has [] broad discretion as to the method to be used in
resolving the factual dispute[s]."  Ritza, 837 F.2d at 369
(quoting 6 J. Moore, W. Taggert, & J. Wicker, Moore's Federal
Practice ¶ 56.03 (2d ed. 1987).

## **DISCUSSION**

In filing its Complaint, Plaintiff seeks a declaration
of the parties' rights and obligations under the WSA, and, if
Defendant is in breach of the WSA for drilling wells within six
hundred feet of Plaintiff's wells, Plaintiff further seeks an

---

[16] Because the Court can decide disputed issues of material
fact on a motion for failure to exhaust nonjudicial remedies, it
is inappropriate to consider such motion as one for summary
judgment (because the Court may not decide disputed issues of
material fact on motions for summary judgment).  See Ritza, 837
F.2d at 369 ("The distinction between summary judgment and
dismissal for matters in abatement [(e.g. failure to exhaust
remedies)] bears on the district court's authority to resolve
factual disputes.").  Therefore, "failure to exhaust non-judicial
remedies . . . should be treated as [a motion to dismiss] even if
raised as part of a motion for summary judgment."  Inlandboatmens
Union, 279 F.3d at 1083 (emphasis added).  Plaintiff asserts that
the Court should treat the instant Motion as one for summary
judgment.  Opposition at 7-8.  This assertion is clearly
incorrect.

award of damages as well as an order enjoining Defendant from any future violation of the WSA.  Complaint at 5.  Before it can be determined if Defendant is in breach of the WSA for drilling wells (with Defendant contending it is only rehabilitating two abandoned wells), it would first have to be determined whether Plaintiff or Defendant is in breach of the WSA for not proceeding with the Will Serve Agreement over the dispute of whether maintenance and flushing is built into the PUC-approved rates and/or whether Plaintiff had the right to reject Defendant's infrastructure expansion plan; and these determinations are made more appropriately by the PUC.  In the event it is concluded that Plaintiff is in breach, then Defendant might be permitted to drill or rehabilitate the two abandoned wells even if it is determinated that such drilling or rehabilitating would otherwise constitute a breach of the WSA.

There is no dispute that Plaintiff is a public utility subject to regulation by the PUC.  Motion at 1 ("The Water Company is a public utility regulated by the PUC."); See Opposition at 9.  Thus, the only dispute in this Motion is whether the parties' contractual disagreement is one to be properly resolved, at least in part initially, within the PUC's supervisory powers.

**I.   Given the PUC's Expertise and Broad Supervisory Powers, Coupled with Authorized PUC Review of Changes in Public Utility Practices, the PUC Should Review this Dispute First.**

The PUC may oversee effectively all aspects of a public utility's business practices and transactions.  The Hawai'i Revised Statutes ("H.R.S.") confer on the PUC the powers of "general supervision . . . over all public utilities." H.R.S. § 269-6(a).  More specifically, the PUC is allocated "investigative powers," under which the PUC may examine <u>all aspects</u> of a public utility:

> The public utilities commission and each commissioner shall have power to examine into the condition of each public utility, the manner in which it is operated with reference to the safety or accommodation of the public, the safety, working hours, and wages of its employees, the fares and rates charged by it, the value of its physical property, the issuance by it of stocks and bonds, and the disposition of the proceeds thereof, the amount and disposition of its income, and all its financial transactions, its business relations with other persons, companies, or corporations, its compliance with all applicable state and federal laws and with the provisions of its franchise, charter, and articles of association, if any, its classifications, rules, regulations, practices, and service, <u>and all matters of every nature affecting the relations and transactions between it and the public or persons or corporations</u>.

H.R.S. § 269-7(a) (emphasis added).  Based on this broad allocation of authority, essentially any dispute involving a public utility may be reviewed by the PUC.  The Court notes that the parties do not seem to disagree that this dispute could be heard by the PUC; instead, the parties disagree on whether this Court could also hear the case without any PUC adjudication. Plaintiff contends that (1) the PUC is not required to hear this dispute initially and (2) that this Court is just as suited to

make a determination.  <u>See</u> Opposition at 10 (citing cases where it was determined that both the PUC and the courts have concurrent jurisdiction for general contract disputes).  On the other hand, Defendant argues that the PUC is the "exclusive" forum for a dispute such as this one; therefore, this Court may not hear the case without allowing the PUC to review it first. Reply at 2.

The Court finds that the PUC is the appropriate forum to hear this dispute initially because at least part of the dispute requires an interpretation of whether flushing expenses are included in the PUC-approved rates and whether Plaintiff had the right to reject Defendant's infrastructure expansion plan. Moreover, the broad supervisory powers of the PUC, coupled with the PUC's expertise in such matters, weigh strongly in favor of allowing the PUC to make the initial ruling in this dispute as a matter of prudence.

**A.    The PUC Should Determine Who is Responsible for the Expense of Flushing and Maintaining the Infrastructure Expansion as well as Whether Plaintiff Had the Right to Reject Defendant's Infrastructure Expansion Plan.**

The Court concurs that this matter is centered around the parties' obligations under the WSA, together with the Will Serve Agreement, the grant of easements, and the Stipulation.[17]

---

[17] Hereinafter, references to the "WSA" include the following:  the WSA, the Will Serve Agreement, the grant of easements, and the Stipulation.

However, before determining whether Defendant's actions in drilling or rehabilitating the preexisting wells constitute a breach of the WSA, the following determinations would have to be made: (1) whether the cost of flushing and maintaining Defendant's proposed infrastructure expansion was built into the PUC-approved rules and rates, and (2) whether Plaintiff could reject the infrastructure expansion plan and also refuse to provide water service unless Defendant agreed to certain terms. Both of these determinations should be made initially by the PUC.[18]  In the event it is concluded that Plaintiff is in breach, then Defendant might be within its rights to drill or rehabilitate the two abandoned wells notwithstanding such action might otherwise constitute a violation of the WSA.

Before reaching the WSA drilling issue, however, it is the PUC that needs to first determine each party's obligations with regard to both the flushing expenses and the approval of the infrastructure expansion plan.[19]

_____

[18] Defendant asserts that the offers to sell water in bulk (and to sell the water company) strengthen its argument that the PUC should initially adjudicate Plaintiff's claims.  However, the Court notes that the parties never entered into an agreement for bulk water service (or for the sale of the water company) that would obligate them to pursue such an agreement.  If ultimately, however, the parties wish to pursue a bulk water agreement (or a buyout of the water company) in the future, the Court finds that PUC approval would be necessary.

[19] As discussed in this order, a determination of Plaintiff's potential breach directly involves an application of the PUC-approved rules and regulations, and thus initial review

A determination by the PUC is additionally required because both parties still contemplate Plaintiff's service of water to Defendant under the WSA.  <u>See</u> Supp. Friend Decl. ¶¶ 12-13; Lipscomb Decl. ¶ 11.  A ruling on the parties' obligations under the WSA could affect future water service under that agreement, and such water service is regulated by the PUC-approved rules and regulations (expressly incorporated into the WSA).  Thus, it would be improper for this Court to go forward under these circumstances because the Court would effectively assume the PUC's general supervisory and investigative powers under H.R.S. §§ 269-6 and 269-7.

The PUC must be notified, and the PUC may approve or deny, any potential alteration of a prior-approved rate or practice of a public utility:

> No rate, fare, charge, classification, schedule, rule, or practice . . . shall be established, abandoned, modified, or departed from by any public utility, except after thirty days' notice to the commission as prescribed in section 269-12(b), and prior approval by the commission for any increases in rates, fares, or charges.[20]

---

by the PUC is appropriate.

[20] The notice requirement of § 269-12(b) states:

> Any notice provided pursuant to section 269-16(b), shall plainly state the rate, fare, charge, classification, schedule, rule, or practice proposed to be established, abandoned, modified, or departed from and the proposed effective date thereof and shall be given by filing the notice with the commission and keeping it open for public inspection.

H.R.S. § 269-16(b).  The cost of flushing and maintaining the infrastructure expansion was not a charge (or rate) clearly contemplated in either the rules and regulations approved by the PUC, or in the CPCN application with the PUC itself.  The Court finds that Plaintiff has failed to show that any provision in the PUC-approved rules and regulations require Defendant to pay for flushing of the infrastructure expansion.  <u>See</u> Reply at 14.

In attempting to require Defendant to pay for flushing of the infrastructure expansion, and in rejecting the infrastructure expansion plan, Plaintiff was possibly either establishing, abandoning, modifying, or departing from the PUC-approved rates and charges, and the PUC-approved rules and practices of water service.  Such actions are not permissible without notifying the PUC and obtaining its approval.  <u>See</u> <u>Molokoa Village Development Co., Ltd. v. Kauai Elec. Co., Ltd.</u>, 60 Haw. 582, 586-87, 593 P.2d 375, 379 (1979) (holding that the electric company's charges for extension of service lines were governed by the PUC-approved tariff; thus, the fact that the charges were more favorable then those in the tariff "was unlawful" because the electric company did not seek "prior approval of the Commission" as required by § 269-16). The Hawai'i Supreme Court has explained the rationale for such a requirement:

> [A public utility] is not free to operate in a manner
> which is other than or different from that which the

22

Commission has approved.  This is an important part of the statutory scheme.  It is not in the public interest for [a public utility] to enter the field and the[n] operate as it chooses.

Application of Island Airlines, Inc., 47 Haw. 1, 7-8, 384 P.2d 536, 542 (1963).  Plaintiff has not provided any evidence that it ever requested that the PUC determine who was obligated to pay the costs of flushing the infrastructure expansion, or that Plaintiff ever confirmed with the PUC any right to reject the infrastructure expansion plan.[21]

As to the costs of flushing the infrastructure expansion, Plaintiff has not pointed to any provision, either in the WSA or the PUC-approved rules, that would tend to show whose obligation it is to pay for the actual flushing costs of the infrastructure expansion.[22]  As to its right to reject the infrastructure expansion plan, Plaintiff does argue that specific rules, within the PUC-approved rules and regulations, provide that Plaintiff had the right to reject Defendant's infrastructure

---

[21] The fact that Plaintiff did not seek PUC approval earlier does not now negate the requirement for PUC review, especially given both parties' representations that each is still contemplating going forward with water service under the WSA.

[22] Plaintiff simply argues that it is willing to flush the water, but only at PUC-approved rates paid for by Defendant; however, Plaintiff does not cite to any relevant provision that would require Defendant to pay for the flushing.  See Libscomb Decl. ¶ 8.

expansion plan.[23/]   Supp. Decl. Response at 3-5.   The Court finds, however, that it is not definitively clear how the relevant provisions of the rules would apply specifically under the circumstances of Defendant's infrastructure expansion proposal. Further, Plaintiff has failed to show that its ultimate withdrawal from the Will Serve Agreement was a PUC-allowed modification of service, or that the withdrawal was otherwise permitted under the PUC-approved rules and regulations.   See Libscomb Decl. ¶¶ 8-9.   Regardless, Plaintiff's efforts to ask this Court to directly interpret the PUC-approved rules only strengthens the argument that the PUC should be making these initial determinations.

Therefore, Plaintiff has not met its burden of showing why it should not first raise its complaint with the PUC. Accordingly, this Court refrains from any ruling until Plaintiff has first obtained PUC review.[24/]

_____

[23/] Defendant asserts that Plaintiff had no right to approve or disapprove the infrastructure expansion plan under the WSA, and that Plaintiff asserted its right to reject the infrastructure plan for the first time under the Will Serve Agreement.   Supp. Friend Decl. ¶ 4.   Plaintiff counters that the WSA expressly incorporates the PUC-approved rules, which rules allow Plaintiff to reject the infrastructure expansion plan.   See Supp. Decl. Response at 3.   The PUC should initially address these arguments and determine how the language in the rules cited by Plaintiff apply under these specific circumstances.

[24/] At a minimum, Plaintiff should seek a declaratory action with the PUC as to the applicability of the PUC-approved rules and regulations (and the function of the rules and regulations under the WSA) to the costs of flushing and Plaintiff's ability

**B.    Moreover, it is Prudent to Allow the PUC to Decide a Dispute Directly Involving, and Brought by, a Public Utility.**

Even if PUC review were not required in this case, the PUC should still review Plaintiff's claim under considerations of prudential exhaustion.  "Prudential exhaustion comes into play where '(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes[25/] and to preclude the need for judicial review.'" Gonzales v. Department of Homeland Sec., 508 F.3d 1227, 1234 (9th Cir. 2007) (quoting El Rescate Legal Servs., Inc. v. Executive

---

to reject the infrastructure expansion plan.  The PUC has the authority to issue such declaratory relief.  See H.R.S. § 91-8 (providing that "[a]ny interested person may petition an agency [(e.g. the PUC)] for a declaratory order as to the applicability of any statutory provision or of any rule or order of the agency.").  However, this Court sees no reason why the PUC should not review Plaintiff's entire claim (other than seeking money damages), given its close relationship to the PUC-approved rules, and given the PUC's expertise in dealing with the business transactions of public utilities.  The PUC has the authority to interpret the WSA and can generally invalidate agreements that are inconsistent with the PUC-approved rules and regulations.  See infra, section I.B.(3).

[25/] Because the PUC has not previously reviewed the instant dispute, there is no "mistake" that the PUC would be "correcting" under these circumstances.  Thus, the Court disregards this aspect of the third consideration, and focuses solely on the latter half of the consideration, i.e., whether PUC review will preclude the need for further judicial review.

_Office of Immigration Review_, 959 F.2d 742, 747 (9th Cir. 1992). The Court addresses each of these considerations in turn and finds that prudential exhaustion requires Plaintiff to seek PUC review.

> **(1)  PUC Expertise Regarding Public Utility Practices Exceeds that of this Court**

As discussed supra, the PUC has significant expertise in dealing with public utilities – specifically in regard to business transactions between such utilities and other entities. _See_ H.R.S. § 269-7(a) ("The public utilities commission and each commissioner shall have power to examine into . . . all [of a public utility's] financial transactions, [and] its business relations with other persons, companies, or corporations.").[26/] Further, the broad supervisory powers created under the PUC statutory provisions reinforce the notion that the PUC should be given priority in reviewing disputes involving a public utility's

---

[26/] This language contradicts Plaintiff's assertion that the PUC can only address contracts "between public utilities and affiliated entities." Opposition at 13; _see_ H.R.S. § 269-19.5 (specifically giving the PUC authority over contracts between the public utility and parties with affiliated interests (people or entities with some form of direct interest in the public utility)). Given that the PUC has authority to review _all_ of a public utility's business transactions, § 269-19.5 is only an elaboration on PUC review of one specific type of transaction. There is no indication that § 269-19.5 has any effect on the broad PUC authority to review all public utility contracts. Moreover, the PUC surely has authority to review a contract between Plaintiff, a public utility, and Defendant, a party that has agreed (under the Will Serve Agreement) to be subject to all of the PUC-approved rules and regulations. _See_ Motion Ex. H ¶ 1.

business deals for service of that utility.  See Public Utilities

Commission, Dept. of Regulatory Agencies v. Honolulu Rapid

Transit Co., Ltd., 56 Haw. 115, 119, 530 P.2d 742, 745 (1975)

("[T]he statutory scheme of HRS ch. 269 displays a public policy

that favors PUC jurisdiction over activities where the public

welfare depends on proper conduct and regulation.").

The Court finds that the PUC is surely more experienced

in the specifics of public utility contracts; therefore, the PUC

can more accurately interpret the WSA – an agreement that

involves the delivery of water (a specific utility that the PUC

has authority to regulate).  Therefore, this consideration weighs

strongly in favor of requiring Plaintiff to exhaust its remedies

initially with the PUC.

### (2)   Plaintiff Should Not Be Permitted to Bypass the PUC Administrative Scheme

As a public utility that has gone through the lengthy

CPCN application process, Plaintiff is well aware of the scope of

the PUC's supervisory authority.  Clearly, the Hawai'i

legislature intended that the PUC had the authority to review any

matter involving a public utility like Plaintiff.  See H.R.S. §

269-7(a), (c) (conferring PUC investigative powers over "all

matters of every nature" involving a public utility, and

providing that such investigation may be initiated by the PUC on

its own, by the public utility, or by "any person.").  Therefore,

allowing Plaintiff to avoid PUC review on its contract claims

27

would undermine the broad authority explicitly conferred on the PUC to review such claims.[27/]   Thus, this consideration also weighs in favor of requiring PUC review.

### (3) PUC Review of Plaintiff's Claims May Limit the Need for Judicial Review

Under its broad regulatory authority, the PUC may interpret a contract to which a public utility is a party. Defendant has correctly illustrated to the Court in its exhibits a case where the PUC has specifically reviewed a contract between a public utility and another entity.  See Motion Ex. L, In the Matter of the Public Utilities Commission, Docket No. 2006-0021, Decision and Order No. 23725 (October 16, 2007) (holding that an agreement for free sewer services between a public utility and private parties was unlawful to the extent that it conflicted with the PUC-approved tariff).  Thus, Plaintiff cannot argue that the PUC may not initially adjudicate Plaintiff's claims.  The Court finds that the PUC has the authority to determine each party's rights and obligations as to the flushing costs and the approval of the infrastructure expansion.  Further, the PUC has the authority to interpret the WSA and its surrounding

---

[27/] This does not necessarily mean that the PUC must review all claims raised by a public utility.  There are surely instances where a Court would be just as adept as the PUC in adjudicating a claim involving a public utility.  In the instant case, however, the close relationship between the alleged breaches of the WSA and the PUC-approved rules for water service weighs in favor of finding that PUC review is appropriate.

agreements, in order to address Plaintiff's breach of contract claims specifically brought under the WSA.  Therefore, judicial review (at least initially) is not required and this consideration also favors review by the PUC at this time.[28]

### (4) Summary of Prudential Exhaustion Considerations

The Court sees no reason why it is better suited than the PUC to rule on a dispute over water services.  The WSA stipulates that Plaintiff's rights to enforce the WSA are only available "to the extent permitted by the PUC."  WSA ¶ 11(g). Yet Plaintiff requests (without first seeking a PUC determination) that this Court determine the rights and

---

[28] The Court notes that the PUC may decline to address certain aspects of Plaintiff's claim or that the PUC may not have the authority to order all the relief that Plaintiff seeks (i.e. the PUC can issue declaratory relief but it cannot award money damages).  In such case, Plaintiff could return to this Court to seek the relief that the PUC was unable to grant (thus the Court stays the proceedings in lieu of dismissal).  However, if either of the parties seek to appeal the decision of the PUC, such appeal must go through the appropriate channels at the state court level and cannot be brought before this Court.  See H.R.S. § 269-16(b)(4) ("If any party is aggrieved by the decision of the commission or the designated hearings officer, the party may appeal to the intermediate appellate court, subject to chapter 602, in the manner provided for civil appeals from the circuit court.")  Regardless, at this juncture, it is prudent for the PUC to first adjudicate Plaintiff's claims (and decide which claims it has jurisdiction to adjudicate) because such adjudication could eliminate the need for further judicial review.  See State of California v. Oroville-Wyandotte Irrigation District, 409 F.2d 532, 536 (9th Cir. 1969) (holding that "[t]he California Public Utilities Commission has the primary right of determining its own jurisdiction, and it would be inappropriate for a federal court to pre-empt this question").

obligations (under the PUC-approved rules and regulations) as to
the flushing costs and the rejection of the infrastructure
expansion, as well as the extent that Plaintiff may enforce the
WSA or recover for breach.  Further, the WSA involves the
operation of water service – the specific service that Plaintiff
is under PUC supervision to provide.  Finally, the PUC has
specific authority to review contracts (like the WSA) between the
regulated public utility (Plaintiff) and any other entity
(Defendant).  Accordingly, as a prudential matter, Plaintiff
should exhaust its remedies with the PUC and any further
proceedings before this Court should be stayed.

## II.   It is Prudent to Stay All Proceedings Pending PUC Adjudication

Defendant asserts that the Court should impose a stay
on any claims not dismissed for failure to exhaust administrative
remedies.  Motion at 13.  The Court finds that all claims should
be brought before the PUC for its review.  However, because the
PUC may not have authority to order all remedies (e.g. award
damages) that the parties seek, a stay is appropriate under the
circumstances.

This Court has broad discretion to control its docket
and may stay proceedings where the Court deems it necessary for
proper adjudication.  See Mediterranean Enterprises, Inc. v.
Ssangyong Corp., 708 F.2d 1458, 1465 (9th Cir. 1983) ("The trial
court possesses the inherent power to control its own docket and

30

calendar."); Landis v. N. Am. Co., 299 U.S. 248, 254-55 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). A stay may be particularly appropriate where, as here, separate proceedings must be necessarily concluded before the court may take any further action:

> [A] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court.

Mediterranean Enters., 708 F.2d at 1465.

The only claims before this Court are Plaintiff's cause of action for declaratory relief and damages for breach of contract. As noted above, Plaintiff has not exhausted its remedies with the PUC on these claims and must do so. However, after adjudicating before the PUC, it may still be necessary for this Court to rule on certain aspects of the claims that either the PUC declines to address, or lacks the authority to rule on (e.g. awarding damages). Thus a stay is appropriate in order to

permit the parties to return to this Court if the PUC does not completely adjudicate all of Plaintiff's claims.[29/]

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion to Dismiss for lack of subject matter jurisdiction and GRANTS Defendant's Motion to stay all proceedings pending adjudication of Plaintiff's claims by the Hawai'i Public Utilities Commission.  The Court finds that it cannot analyze the claimed drilling breach under the Water Service Agreement without also addressing the dispute over the expenses of flushing the infrastructure expansion, as well as Plaintiff's right to reject Defendant's infrastructure expansion plan - both issues which

---

[29/] The Court assumes Defendant will not continue to drill or rehabilitate the two abandoned wells during the pendency of this matter before the PUC.  However, Plaintiff may seek an injunction before the PUC if Defendant continues to drill or rehabilitate the two abandoned wells.

The Court notes that the PUC does appear to have authority to enjoin Defendant, so long as the PUC determines that Defendant is subject to the PUC-approved rules and regulations (i.e. a "commission order"), and that Defendant is acting in violation of such rules and regulations by rehabilitating the two abandoned wells.  See Hawai'i Administrative Rules § 6-68-14(a)(d) (stating that the PUC may, upon instituting an investigation, issue an order to show cause which may include "an order of abatement that requires the respondent to cease and desist from any present or future violations of the regulatory law or commission orders").  Although Defendant appears to be subject to the PUC-approved rules and regulations (because it agreed to as much under the Will Serve Agreement), this determination is also left to the PUC.  See Motion Ex. H ¶ 1 (under the Will Serve Agreement, Defendant agrees to "accept and abide by all conditions and provisions of the Rules and Regulations as approved by the Hawaii Public Utilities Commission").

should first be determined by the Hawai'i Public Utilities
Commission. Finally, the Court finds that considerations of
prudential exhaustion weigh strongly in favor of allowing the
Hawai'i Public Utilities Commission to adjudicate Plaintiff's
claims, given the Commission's expertise and broad supervisory
authority over all of the affairs of public utilities.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 1, 2009.



_____
Alan C. Kay
Sr. United States District Judge

Kealia Water Company Holdings, LLC v. Plantation Partners Kauai, LLC, Civ. No.
08-00333 ACK-BMK, Order Denying Defendant's Motion to Dismiss for Lack of
Subject Matter Jurisdiction And Granting Defendant's Motion To Stay All
Proceedings Pending Adjudication By the Hawai'i Public Utilities Commission.